ZULMA ALGARIN, )
)
Plaintiff, )  No. 10 C 02996
)
v. )
)  Judge Edmond E. Chang
LORETTO HOSPITAL, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Zulma Algarin sued her former employer, Defendant Loretto Hospital, alleging discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981; and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*[1] Loretto moves for summary judgment on all counts. R. 29. For the following reasons, Loretto's motion is granted.

## I.

In deciding this summary judgment motion, the Court views the evidence in the light most favorable to Algarin. In July 2006, Algarin began working as a registered nurse in the Behavioral Health Unit at Loretto Hospital. R. 32, Def.'s Stmt. of Facts (DSOF) ¶¶ 8-9. Patients in the Behavioral Health Unit are treated for mental health conditions, such as psychotic behavior or schizophrenia, as well as medical conditions. *Id.* ¶ 10. Rose Geary, the Associate Vice President of Behavioral Health, made the decision to hire Algarin. *Id.* ¶¶ 11, 16. Algarin, a Hispanic woman of Puerto Rican

---

[1] The Court has subject matter jurisdiction in this federal-question case under 28 U.S.C. § 1331.

origin, was sixty-seven years old when she began working at Loretto in July 2006. *Id.* ¶ 7.

As part of its overall initiative to improve patient care, Loretto Hospital created "Rapid Response Teams." R. 30-4, Algarin Dep. Exh. 8. Rapid Response Teams are designed to assist in situations where a patient is experiencing early signs of distress, such as acute changes in respiratory rate, heart rate, blood pressure, bleeding, or consciousness. *Id.* A Rapid Response Team is composed of at least one doctor, one critical care nurse, a respiratory therapist, and the registered nurse assigned to the patient in distress. DSOF ¶ 25. The Team can be paged by any nurse at Loretto Hospital. R. 30-4, Algarin Dep. Exh. 8. Once called, the Rapid Response Team's tasks are to (1) assist the nurse in assessing and stabilizing the patient's condition, (2) organize information that needs to be communicated to the doctor, and (3) educate and support the staff during a challenging patient situation. *Id.*

The registered nurse assigned to the patient has particular duties under the Rapid Response Team protocol. DSOF ¶ 26. Specifically, the nurse must obtain a crash cart, which contains emergency medical supplies, and the patient's medical records from the nursing station. *Id.* After the Rapid Response Team arrives, the nurse assigned to the patient must inform the Team of the patient's vital signs and must present a concise and accurate summary of the situation. *Id.* ¶ 27. It is important for the nurse to provide this information so that the Team can effectively address the patient emergency. *Id.* The Rapid Response Team protocol instructs the nurse to remain with the patient and be available to assist the Team as needed. *Id.*

During Algarin's employment at Loretto, the Rapid Response Team was called to the Behavioral Health Unit several times. R. 30-1, Algarin Dep. at 68. For instance, in February 2007, the Rapid Response Team was called to assist with a patient assigned to Algarin's care. DSOF ¶ 28. One of Algarin's supervisors, Rose Geary, documented the incident. R. 30-8, Geary Dep. Exh. 2. According to Geary's notes, Algarin failed to remain with the patient during the emergency, and did not appropriately communicate with the Rapid Response Team or carry out her duties under the Rapid Response Team protocol. R. 30-8, Geary Dep. Exh. 2. Geary testified that she counseled Algarin about her deficient performance, but Algarin denies receiving any counseling. R. 35, Pl.'s Resp. DSOF ¶ 29.

Instead, Algarin believed that she was being harassed by Geary and another supervisor, Jennifer Parker, due to her race, national origin, and age. *See* R. 36-5, Algarin Dep. Exh. 11. Algarin described her concerns in a written complaint submitted to Ruby Isom, Loretto's Associate Vice President of Human Resources, in February 2007. DSOF ¶¶ 30, 33. Algarin complained that Geary and Parker treated her with "animosity" and made her feel "humiliated, intimidated, harassed, and offended." *Id.* ¶ 34. In the complaint filed with human resources, Algarin alleged that she met with Geary and Parker for her three-month performance evaluation. *See* R. 36-5, Algarin Dep. Exh. 11. According to Algarin, Parker mentioned Algarin's "culture" as part of her "being out there somewhere," and Geary made "a movement with her hand over her head." DSOF ¶ 34. Isom independently interviewed Geary and Parker about Algarin's

3

allegations, and concluded that they did not harass Algarin but had merely raised their performance concerns with Algarin. *Id.* ¶ 36.

Despite Isom's investigation, Algarin contends that Geary and Parker continued to harass her. In June 2007, Algarin overheard Geary tell other hospital staff members that "the Hispanics are the worst." R. 35, Pl.'s Stmt. of Additional Facts (PSOF) ¶ 80. Algarin, who was in a medication room and out of Geary's sight, testified that after hearing Geary's comment, Algarin came out of the room and told Geary that she heard the comment about Hispanics. R. 30-1, Algarin Dep. at 152. Algarin testified that Geary seemed to be caught off guard by Algarin's presence and responded, "Oh, Zulma, what I mean is that you are Hispanic but you never talk Spanish in the unit." R. 30-1, Algarin Dep. at 152. Algarin told Geary that, out of respect to everyone, she did not speak Spanish in the unit. *Id.* at 152-53.

On February 14, 2008, one of Algarin's patients complained of dizziness. DSOF ¶ 42. Algarin took the patient's blood pressure and summoned Dr. Bela Nand for a consultation. *Id.* Dr. Nand examined the patient and determined that the patient should be transferred to the Telemetry Unit. *Id.* Dr. Nand told Algarin that it was not necessary to call the Rapid Response Team. *Id.* As Dr. Nand was writing down her orders, Algarin directed that the patient be placed in a wheelchair while Algarin called Angie Abordo, the Clinical Director of the Telemetry Unit, to arrange for the patient's transfer. *Id.* ¶ 43. Abordo was also working as the hospital's nursing supervisor on duty that day. *Id.* ¶¶ 43, 46. Algarin telephonically reported to Abordo that the patient was complaining of dizziness and hypotension, and had a blood pressure of 60/30 or

60/40. *Id.* ¶ 44. Abordo asked whether Algarin had called the Rapid Response Team.[2] *Id.* Algarin responded that Dr. Nand had seen the patient and told Algarin *not* to call the Rapid Response Team. *Id.* Abordo immediately ran from the fifth floor, down to the Behavioral Health Unit located on the third floor. *Id.* ¶ 45. When Abordo arrived on the Behavioral Health Unit, she discovered that the Rapid Response Team had not been called. *Id.* Abordo ordered that the Team be called. R. 30-1, Algarin Dep. at 176-77.

The Rapid Response Team was paged, and Geary, Parker, and Helen Requilman, Loretto's Manager of Performance Improvement, arrived on the scene. DSOF ¶ 47. After the patient's condition was stabilized, the patient was transferred to the Telemetry Unit as planned. *Id.* ¶ 50. Later that day, Geary, Parker, and Requilman notified Isom that they had observed serious problems with Algarin's performance during the Rapid Response Team emergency. *Id.* ¶ 51. Isom decided to investigate the incident, and requested that each supervisor submit a written statement about Algarin's performance during the emergency. R. 30-10, Isom Dep. at 68. Meanwhile, Isom and Geary agreed that Algarin should be suspended from work pending the investigation. DSOF ¶ 52.

Isom held individual meetings with Algarin's supervisors, and reviewed their written statements as they were submitted to her. R. 30-10, Isom Dep. at 71-72. In

---

[2]Loretto Hospital also contends that, during the phone call, Abordo specifically ordered Algarin to page the Rapid Response Team. Def.'s Br. at 4. Algarin does not directly dispute this contention in her response, nor does she address it in her statement of additional facts. The Court notes that Algarin testified at her deposition that she could not recall whether Abordo ordered her to page the Rapid Response Team during the initial phone call. R. 30-1, Algarin Dep. at 176-77.

particular, Isom considered Abordo's statement, which stated that Algarin disregarded Abordo's order to call the Rapid Response Team. DSOF ¶ 53. Abordo's statement also stated that, once the Team arrived, Algarin could not locate the proper medical equipment needed to start the patient's IV. *Id.* ¶ 54. Helen Requilman's statement similarly reported that Algarin was not familiar with the contents of the crash cart, and had difficulty finding a syringe to use during the emergency. *Id.* ¶ 57. Isom also met with Geary, who recommended that Algarin be fired for her inadequate performance. Pl.'s Resp. to DSOF ¶ 61 (citing Isom Dep. at 74). At the end of the investigation, Isom concluded that Algarin should be fired. DSOF ¶ 61. In a letter dated February 22, Isom informed Algarin that her employment with Loretto Hospital was terminated for negligent and willful action that compromised patient care, customer service, and Hospital operations. *Id.* ¶ 62.

In March 2008, Algarin filed a charge of discrimination, retaliation, and harassment with the Equal Employment Opportunity Commission, through the Illinois Department of Human Rights. R. 1 (Compl.) ¶ 10. In December 2009, the EEOC issued a right-to-sue letter to Algarin, and this action followed. Compl. ¶ 11.

## II.

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

## III.

Algarin alleges that Loretto: (1) discriminated against her because of her race, national origin, and age; (2) retaliated against her for complaining about the discrimination; and (3) subjected her to a hostile work environment.

## A.

### 1. Race and National Origin Discrimination

To survive summary judgment on the Title VII and § 1981 claims, Algarin must adduce evidence that would allow a reasonable jury to find that Loretto's decision to fire Algarin was motivated by her race or national origin. "Discrimination claims under both Title VII and § 1981 are analyzed in the same manner." *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 338 (7th Cir. 2002).

Loretto contends that Algarin was fired because she failed to call the Rapid Response Team during the February 14, 2008 emergency described above, when the blood pressure of a patient assigned to her care fell to a critical level and the nursing supervisor on duty, Angie Abordo, instructed Algarin that the Team needed to intervene. R. 31 (Def.'s Br.) at 10-12. Loretto contends that Ruby Isom thoroughly investigated the February 14 incident, and learned that Algarin's supervisors had serious concerns about Algarin's ability to properly respond in an emergency. Def.'s Br.

7

at 12. Isom concluded that Algarin's continued employment posed a risk to both patients and the hospital. DSOF ¶ 61.

Before making the decision to fire Algarin, Isom gathered information from Abordo, Requilman, Geary, and Parker. *Id.* ¶¶ 51, 53-54, 56-59. Loretto points to Abordo's statement as one of the key pieces of information Isom considered in making her decision. Def.'s Br. at 4-5. Specifically, Abordo wrote that on February 14 she received a call from Algarin about transferring a patient to the Telemetry Unit. DSOF ¶ 54. After learning the patient's blood pressure, Abordo ordered Algarin to call the Rapid Response Team. *Id.* When the call with Algarin ended, Abordo immediately went to the Behavorial Health Unit and discovered that Algarin had not called the Rapid Response Team. *Id.* Abordo again instructed Algarin to call the Team, but Algarin continued to insist that Dr. Nand had examined the patient and determined that the Rapid Response Team was not needed. *Id.* According to Abordo, Algarin also had difficulty following Abordo's order to start an intravenous tube for the patient because Algarin could not locate the medical supplies needed to start the IV. *Id.*

Loretto argues that Abordo's statement, in addition to the other supervisors' accounts of the February 14 incident, prevents Algarin from establishing that she met Loretto's legitimate job expectations at the time she was fired. Def.'s Br. at 10-11. Under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff relying on the indirect method of proof must first establish a prima facie case of discrimination by demonstrating that (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered

an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment. Here, Loretto contends that Algarin was fired because she did not obey a direct order from Abordo and failed to properly execute her duties under the Rapid Response Team protocol. As a result, Loretto argues that she cannot establish the second prong of her prima facie case.

Algarin does not dispute that Abordo was the supervisor who ordered Algarin to page the Rapid Response Team. Pl.'s Resp. DSOF ¶ 54. Instead, Algarin focuses her response on the written performance evaluation she received in December 2007. R. 34, Pl.'s Br. at 11. One of Algarin's supervisors, Jennifer Parker, completed the evaluation, and another supervisor, Rose Geary, reviewed and approved it. PSOF ¶ 69. Algarin argues that the December performance review raises a genuine issue with respect to whether she was meeting Loretto's job expectations. But the performance review occurred before—and thus does not account for—the February 2008 Rapid Response Team incident. The Court agrees with Loretto that "what matters in a discriminatory discharge case is not the employee's past performance, but whether she was meeting the company's expectations at the time of her discharge." *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946 (7th Cir. 2006) (quotation omitted). To be sure, satisfactory prior performance can be relevant, in some cases, to whether an employer's later asserted reason is credible, but the December 2007 performance review here does not bear on the specific February 2008 emergency.

Moreover, the review is not entirely favorable. On a scale of 1 to 4 (with 4 being the most favorable), Algarin received a 2.5 rating in five out of the eleven evaluation

categories. PSOF ¶ 69. One of the comments included in the evaluation states that "Algarin lacks leadership skills and does not always act quickly in critical situations," *see* R. 36-9, Geary Dep. Exh. 4, and that latter comment is particularly supportive of Loretto's proffered reason for Algarin's firing. Another comment indicates that "Algarin does not always capture cooperation from her co-workers and team members whom at times have suggested a [d]istrust of her judgment and decision making skills." R. 36-9, Geary Dep. Exh. 4. Thus, although the review contains some favorable remarks, it also identifies specific problems with Algarin's performance leading up to the February 2008 incident, which resulted in her being fired.

Loretto also argues that Algarin cannot establish the fourth prong of her prima facie case because she is unable to identify any similarly situated employees. Def.'s Br. at 11. Algarin responds that an African-American staff nurse who was disciplined for sleeping on the job serves as a sufficient comparator. Pl.'s Br. at 11. Algarin argues that Geary (who is African-American) treated the African-American nurse more favorably because Geary did not fire him for the sleeping infractions and, instead, provided him only with written warnings. Pl.'s Br. at 4-5.

The similarly-situated inquiry requires "enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (quoting *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007)). Here, Algarin fails to propose a comparator that would allow the Court to conduct a "meaningful comparison." Of course, it is not necessary for the proposed comparator to be identical to the plaintiff

in all respects, but Algarin's conduct during the Rapid Response Team emergency is significantly different from the other nurse's misconduct. The Court concludes that this distinction precludes "the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd on other grounds*, 553 U.S. 442 (2008).

Algarin also attempts to satisfy the similarly-situated requirement by presenting evidence that someone at Loretto forwarded a confidential memorandum containing patient information to the Illinois Department of Employment Security. Pl.'s Br. at 5. Under Loretto's disciplinary policy, sending an unredacted memo to a third-party would constitute misuse of a patient's information and could result in immediate termination under the policy. PSOF ¶ 78. However, Algarin does not identify *who* sent the memo or whether that person was disciplined or terminated as a result of the infraction. This evidence does not come close to identifying a similarly-situated employee outside of the protected class.

To summarize, Algarin has failed to establish the second and fourth prongs of a prima facie case of discrimination. Therefore, Algarin cannot proceed under the indirect method of proof.

Alternatively, Algarin argues that she can prove her race and national original discrimination claims under the direct method. The direct method of proof requires Algarin to present direct or circumstantial evidence that creates a "convincing mosaic" of discrimination on the basis of race or national origin. *Abuelyaman v. Ill. State Univ.*,

667 F.3d 800, 2011 WL 6188446, at *7 (7th Cir. 2011). Here, Algarin relies on circumstantial evidence, which the Seventh Circuit has said typically falls into one of three categories: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment;" and (3) pretext evidence, where the employee was qualified for and fails to receive the desired treatment, and the employer's stated reason for the difference is unworthy of belief. *Hemsworth v. Quotesmith.Com, Inc.,* 476 F.3d 487, 491 (7th Cir. 2007); *see also Adams v. Wal–Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir.2003) (when proceeding via the direct method, "circumstantial evidence . . . must point directly to a discriminatory reason for the employer's action").

Algarin's "mosaic" has three main pieces. Algarin first contends that Geary and Parker made "ambiguous oral statements" about Algarin's race and national origin. Specifically, Algarin points to Parker's comment that Algarin looked like she was "out there somewhere" and then attributing Algarin's demeanor to her "culture." Pl.'s Br. at 4. Not only was this comment made one year before Algarin was fired, but the statement is unrelated to Isom's decision to fire Algarin for inadequate patient care on February 14. *See, e.g., Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 781-82 (7th Cir. 2007) ("[S]tray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment.") (quotation omitted).

Algarin also identifies Geary's statement that "Hispanics are the worst" as circumstantial evidence that Algarin was unlawfully fired. Standing alone, that statement raises a serious alarm of discriminatory intent. But Algarin described the context of Geary's statement at her deposition. According to Algarin, when she came out of the medication room and surprised Geary, Geary explained that she was referring to Hispanic employees who spoke Spanish in the unit, a purported concern of patients and coworkers who could not understand Spanish and did not know what the Spanish-speakers were saying. R. 30-1, Algarin Dep. at 152-53. Like Parker's comment, in this case—and the relevancy of evidence must always be evaluated on a case-by-case basis—this statement is not circumstantial evidence of discrimination because it was not made around the time that Algarin was fired and does not refer to the adverse employment action. *See Overly v. KeBank Nat'l Ass'n*, 662 F.3d 856, 865 (7th Cir. 2011). Geary's statement, made eight months before Isom decided to fire Algarin, does not permit an inference of intentional discrimination.

Also, in order for Geary's alleged prejudice to be attributed to Loretto, as Algarin argues, there must be evidence that Geary intended for her discriminatory remark to cause an adverse employment action, and her remark must have proximately caused Isom's decision to fire Algarin. *See Staub v. Proctor Hosp.*, – U.S. –, 131 S. Ct. 1186, 1194 (2011) (if a supervisor performs a discriminatory act that is intended to cause an adverse employment action, and act is proximate cause of ultimate adverse action, then employer is liable). Geary's alleged actions fail to meet either criteria. Even if she did make the comment about Hispanics, the comment was not directed at Algarin, and

there is no evidence that Geary intended her remark to cause an adverse employment action in February 2008. Second, Algarin is unable to show that Geary's alleged animus was the proximate cause of the employment decision. It is true that Geary participated in the decision to fire Algarin, but Geary was one of several supervisors Isom spoke to during her investigation of the Rapid Response Team incident. It is undisputed that Isom also relied on statements from Abordo, Requilman, and Parker. Abordo, Requilman, and Parker each identified problems with Algarin's performance in February 2008. From all of this information, Isom determined that Algarin should be fired. Due to the breadth and nature of Isom's investigation, a reasonable jury could not conclude that Isom relied almost exclusively on Geary in deciding to fire Algarin. *Cf. Staub*, 131 S. Ct. at 1193 (internal investigation based upon facts provided by biased supervisor could support a cat's paw case).

For the second category of circumstantial evidence, Algarin contends that she was treated differently than a similarly situated African-American staff nurse. The Court addressed this issue with respect to Algarin's indirect case. *See supra.* For the reasons already discussed, the African-American nurse was not "similarly situated" to Algarin. Nor does the confidential memorandum incident, also described above, provide circumstantial evidence of discrimination against Algarin.

Finally, Algarin contends that Loretto's reason for firing her is a pretext for discrimination. A pretext is a "lie, specifically a phony reason for some action." *Paul v. Theda Medical Ctr., Inc.*, 465 F.3d 790, 794 (7th Cir. 2006) (quotation omitted). Thus, "[t]o show pretext, plaintiff must show more than defendant's decision was

mistaken, ill considered or foolish, and as long as the employer honestly believes [its stated] reasons, pretext has not been shown . . . The only concern in reviewing an employer's reasons for [an adverse employment action] is the honesty of the employer's beliefs." *Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007) (quotations omitted).

Algarin seeks to demonstrate pretext first by showing that her decision not to call the Rapid Response Team was well-founded. Pl.'s Br. at 6. Algarin argues that she was following Dr. Nand's orders, the patient's blood pressure was 60/40, and the patient was not exhibiting other signs of distress. This argument, however, does not demonstrate that Loretto's position that the patient's low blood pressure warranted a call to the Rapid Response Team is *dishonest*. Nor does this argument rebut Loretto's other reason for firing Algarin—namely, that Algarin did not properly perform her assigned duties once the Team arrived on the scene. Although Algarin disagrees with Loretto's assessment of her performance on February 14, that does not mean that the supervisors' negative statements to Isom were the result of unlawful discrimination. *Brill v. Lante Corp.*, 119 F.3d 1266, 1273 (7th Cir. 1997) ("[T]he question is not whether the employer's performance ratings were *right* but whether the employer's description of its reasons is *honest*." (emphases in original) (quotation omitted)).

Algarin next contends that Abordo, Geary, and Requilman gave contradictory and inconsistent statements about what occurred on February 14. Pl.'s Br. at 7-8. Algarin claims that the inconsistencies demonstrate that Loretto's reason for firing Algarin is untruthful. Not so. For instance, Algarin alleges that Geary's testimony is

inconsistent because she first testified that the patient's blood pressure was 60 over 0 at the time that Algarin assessed the patient with Dr. Nand. *Id.* at 7. Geary testified that the patient's blood pressure had *worsened* between the time Dr. Nand assessed the patient and the time Algarin called the Telemetry Unit, but Geary also testified that the patient's blood pressure changed from 60 over 0 to 60 over 40. Geary's testimony is somewhat confusing because, as Loretto points out, later in the deposition Geary testified that she was aware that the patient's blood pressure changed because there was a report of the blood pressure being 60 over 40 and then a blood pressure report of 60 over 0. R. 36-6, Geary Dep. at 91. In any event, Geary's testimony about the patient's initial blood pressure was based on information relayed to her by Abordo. Geary was not present for Algarin's initial phone call to Abordo in the Telemetry Unit. R. 30-7, Geary Dep. at 84-85. As discussed further below, whether Geary confused the blood pressure readings at her deposition or gave inconsistent testimony on this point does not establish pretext. The same is true for the alleged contradictory statements given by Geary and Requilman. Algarin argues that Requilman stated that Algarin was unable to locate a syringe that the Rapid Response Team needed during the emergency, but Geary testified that a syringe is not needed to start an IV on a patient. Pl.'s Br. at 8. Algarin also alleges that portions of Abordo's written statement are inconsistent with testimony she provided at the Illinois Department of Employment Security hearing.

It is true that "the consistency of the *explanation* provided by an employer at the time of an employment decision and in an administrative proceeding is evidence

of the veracity of the employer's explanation at summary judgment" and a party "may avoid summary judgment by pointing to specific facts that place [an employer's] explanation in doubt." *Zaccaganini v. Charles Levy Circulating Co.*, 338 F.3d 672, 676-77 (7th Cir. 2003) (emphasis added); *see also Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005) (pretext can be reasonably inferred where employer provides shifting or inconsistent reasons for the employment decision). In this case, Algarin fails to show how the alleged inconsistencies she has identified raise an issue of fact as to whether Loretto's reason for firing Algarin is a lie. Loretto's position has always been that Algarin was fired due to her unsatisfactory performance during the Rapid Response Team incident on February 14. Loretto asserts that Algarin should have called the Rapid Response Team after learning of the patient's critically low blood pressure. *See* Def.'s Reply at 10-11. Isom, the decisionmaker in this case, considered several statements from Algarin's supervisors before concluding that Algarin's continued employment posed a risk to patients and to the hospital. The evidence presented by Algarin relates to minor differences among the various witnesses' recollections of what happened on February 14. This evidence does not raise a question of fact as to the believability of Loretto's purported reason for the employment decision.

Putting together these items of circumstantial evidence, a reasonable jury could not conclude that Isom decided to fire Algarin because she is Hispanic and of Puerto Rican descent. The evidence presented by Algarin is insufficient to survive summary judgment on her discrimination claims under Title VII and § 1981. Accordingly, the

Court grants Loretto's motion for summary judgment on Algarin's discrimination claims in Counts 1 and 2.

### 2.    Age Discrimination

Turning to Algarin's age discrimination claim, Algarin must adduce evidence that would allow a reasonable jury to find that but for her age, Loretto would not have subjected her to an adverse employment action. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S. Ct. 2343, 2351 (2009); *Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 n.3 (7th Cir. 2011). In other words, under the Age Discrimination in Employment Act, Algarin must show that age was the determinative factor—not just a motivating factor—in Loretto's decision to fire her. *See Gross*, 129 S. Ct. at 2352; *Lindsey v. Walgreen Co.*, 615 F.3d 873, 876 (7th Cir. 2010). Algarin cannot meet this burden.

Algarin attempts to prove age discrimination by using the indirect method. To do so, Algarin must first establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) her job performance met Loretto's legitimate job expectations; (3) she suffered an adverse employment action; and (4) and (4) similarly situated others not in her protected class received more favorable treatment. *See Everroad v. Scott Truck Sys.*, 604 F.3d 471, 477 (7th Cir. 2010). For the reasons already discussed, Algarin has not raised a genuine factual issue with respect to whether she was meeting Loretto's performance expectations in February 2008. *See supra* pages 8-10.

Additionally, even under this indirect method, there are no facts in the record to show that Algarin was fired because of her age. *See Senske v. Sybase, Inc.*, 588 F.3d

501, 507-09 (7th Cir. 2009) (affirming summary judgment for employer where plaintiff failed to establish that age was the "but-for" cause of his termination). Finally, even if Algarin could make out a prima facie case of age discrimination, there is no evidence that Loretto's reasons for firing her were pretextual.

Accordingly, the Court grants Loretto's motion for summary judgment on Algarin's age discrimination claim (Count 3).

## B.

Algarin claims that Loretto retaliated against her for complaining about discrimination to Loretto's human resources department. Title VII forbids an employer from discriminating against an employee who "opposed any practice" prohibited by Title VII or who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). "The antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). The retaliation provisions of the ADEA are materially identical to the Title VII provision, and § 1981 also encompasses retaliation claims. *See* 29 U.S.C. § 623(d) (ADEA); *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008) ("42 U.S.C. § 1981 encompasses claims of retaliation").

"Like discrimination, retaliation may be established by either the direct or indirect methods of proof." *Coleman*, 667 F.3d at 859. Algarin relies on the indirect method. To establish a prima facie case of retaliation under the indirect method of proof, Algarin must show, among other things, that she met Loretto's legitimate job expectations and was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 742 (7th Cir. 2011). As discussed above, Algarin is unable to establish these elements. Accordingly, Loretto's motion for summary judgment on the retaliation claims in Counts 1 and 2 is granted.

## C.

Finally, Algarin claims that the harassment she suffered based on her race and national origin created a hostile work environment in violation of Title VII and § 1981. To survive summary judgment on this claim, Algarin must provide "sufficient evidence to create a material issue of fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) [her] race [or national origin] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must [be] . . . a basis for employer liability." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010); *see also Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011) (applying the same analysis to Title VII hostile work environment claim as to § 1981 hostile work environment claim); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). With respect to the first and third elements, "whether an environment is 'hostile' or 'abusive' can be determined only by

looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Ellis*, 650 F.3d at 647. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted).

Algarin alleges that her supervisors, Geary and Parker, frequently yelled at her in front of other staff members and were generally abrasive toward her. Pl.'s Br. at 14. Algarin claims that Parker's comment about Algarin's "culture" and Geary's remark that "Hispanics are the worst" demonstrate that their hostility was motivated by Algarin's race and national origin.

Loretto argues that neither statement supports Algarin's harassment claim. First, Loretto argues that Algarin fails to tie Parker's comment about Algarin looking "like she was out there somewhere" to Puerto Rican or Hispanic culture. Def.'s Reply at 4. "[M]istreatment at work . . . is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (7th Cir. 2001) (citing *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79-80 (1998)). A remark accusing someone as "out there somewhere" has no explicit (or implicit, for that matter) connection to race or national origin. So the Court agrees with

Loretto that Parker's comment does not support Algarin's claim that she was harassed because of her race or national origin.

Loretto next argues that Geary's comment about Hispanics must be viewed in the context of the entire exchange between Algarin and Geary. This exchange was discussed above; to repeat, according to Algarin, when she came out of the medication room and surprised Geary, Geary explained that she was referring to Hispanic employees who spoke Spanish in the unit. R. 30-1, Algarin Dep. at 152-53. Algarin testified that Geary did not know Algarin was present and, upon seeing Algarin, immediately stated that the comment was about other Spanish-speaking nurses, who presumably made non-Spanish-speaking patients and coworkers uncomfortable. Thus, from the record, it is clear the Geary's comment was not made directly to Algarin, nor was it even about Algarin. In considering whether comments create an environment sufficiently hostile to be offensive, courts often consider whether the alleged offensive comments were made in the presence of the plaintiff and directed at the plaintiff. *See, e.g., McPhaul v. Bd. of Comm'rs of Madison Cnty.*, 226 F.3d 558, 567 (7th Cir. 2000); *Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) (emphasizing that most of the offensive racial comments were isolated and not actually directed at the plaintiff and therefore did not create a sufficiently hostile environment).

The Court concludes that the two comments in this case, which occurred over the course of one year, are too isolated and not severe enough to establish an objectively hostile work environment under Title VII. *See Scruggs*, 587 F.3d at 841. This conclusion does not condone the remarks themselves, but the law demands that

Loretto's motion for summary judgment on Algarin's harassment claims in Counts 1 and 2 be granted.

## V.

For the reasons stated above, Loretto's motion for summary judgment [R. 29] is granted.

ENTERED:

Honorable Edmond E. Chang
United States District Judge

DATE: March 5, 2012